UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**HECTOR ENAMORADO,**<br><br>Defendant. | Criminal No. 15-10338-FDS |

## GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS

### INTRODUCTION

The defendant, Hector Enamorado, has moved to suppress statements made to officers of the Chelsea Police Department on December 16, 2014 after he received his <u>Miranda</u> rights in Spanish multiple times -- verbally and in writing, and after he signed a waiver of rights form on which he requested to speak with officers.  To try to justify his motion, Enamorado claims that he did not understand his rights due to his limited education, due to allegedly being under the influence of drugs and alcohol, and since he spoke a different dialect of the Spanish language. Defendant's Affidavit in support of his Motion to Suppress, document #1855.  <u>Id.</u>  Enamorado signed a written waiver of his rights on which he stated just the opposite.  Specifically, Enamorado agreed to speak with Detective Stephen Garcia and Massachusetts State Trooper Timothy O'Connor and indicated this in writing by checking "<u>Si</u>' on the <u>Miranda</u> Rights form when it stated:

> Having these Rights in mind do you wish to make a knowing, voluntary and intelligent waiver of these rights and answer any questions or make any statements at this time?"

<u>See</u> Exhibit 1, the waiver of Miranda rights form in Spanish, together with a blank form in

English, Exhibit 2.

The defendant knowingly, intelligently and voluntarily waived his Miranda rights that he well understood before making admissions. Moreover, there is no evidence that he was under the influence of drugs or alcohol at the time of the statement.

## BACKGROUND[1]

On December 14, 2014 at approximately 3:04 a.m., Chelsea police responded a call from 60 Chester Avenue, where two victims were suffering from multiple gunshot wounds. Javier Ortiz was pronounced dead within the hour. The second person, Victim 25, survived. Later that day, Victim 25 and two other witnesses were shown photo arrays and identified Enamorado as the shooter. A warrant was issued for Enamorado's arrest on the state court charges of murder and armed assault with intent to murder.

Two days later, on December 16, 2014, Massachusetts State Trooper Timothy O'Connor arrested Enamorado after a traffic stop on Route 90 Westbound in Westborough. Enamorado was transported to the Chelsea Police Department. At 9:14 p.m., he was booked in the usual course by Chelsea Police Officer David Delaney. See attached Booking sheets, Exhibit 3. Enamorado exhibited no signs that he was under the influence of drugs or alcohol. See Booking Observations checklist, Exhibit 4. Enamorado was shown his rights that are posted in the Booking area, see attached photos of the rights posted in the Booking area in Spanish, Exhibit 5, and signed a form at the Booking area indicating that he understood his rights, Exhibit 6.

At approximately 9:33 p.m., the defendant was brought upstairs to an interview room. Miranda rights were provided by Detective Stephen Garcia who read Enamorado his rights in Spanish from a Chelsea Police Department form while a copy of the same form was in front of

---

[1] This is the expected testimony of the government's witnesses at the evidentiary hearing based upon the reports of the incident.

Enamorado to read along.  See DVD of the interview, Exhibit 7 and still photos taken from it, Exhibit 8.  At 9:35 p.m., Enamorado signed the waiver of rights form agreeing that he understood his rights but signed the name "Jesus Gonzales."  See Exhibit 1, and Exhibit 8.  The officers also signed the form.  Id.  Once the written waiver was executed, Trooper Timothy O'Connor and Detective Garcia interviewed Enamorado in Spanish.  See Exhibit 7.   Only after a review of the interview did the Chelsea Police Department realize that while the video portion of the recording was working properly, the audio recording had malfunctioned.  Id.  The recording clearly captures the video from the entirety of the officers' meeting with Enamorado and the audio from approximately the first twenty seconds; afterward only a few sounds are discernable.  Id.  To date, attempts to recover the audio portion of the recording have failed.

O'Connor wrote a report of the interview and Garcia also reviewed it before completion.  During the interview, Enamorado made certain admissions but did not take responsibility for the shootings.  In sum, Enamorado, after initially identifying himself as Jesus Gonzalez, born on October 22, 1978 and residing at 119 Shurtleff St., #2, admitted that he was Hector Enamorado, also known as "Vida Loca."  He also explained that he knew why he was arrested.  He stated that he was a member of the MS-13 gang and that, after drinking alcohol and using cocaine, he got in a fight with members of the 18th Street gang at 60 Chester Avenue.  After they punched him in the face and burned his arm, injuries which the video recording shows him pointing to, he left while promising them, "I'll be back and you'll see."

Enamorado then stated that, though he had no memory of what happened later, but *if he did return to 60 Chester Ave., it was for revenge*.  (emphasis added).  He further said that when he woke up the next morning, he knew something bad had happened.  He explained that after he

saw his face on the news (a wanted for murder poster was issue with his name and photo on the flier), Enamorado described that he tried to flee to New York.

At the conclusion of the interview that lasted about an hour, Enamordo signed a consent to provide DNA form that was also in Spanish, but this time he signed his true name, Hector Enamorado.  See Exhibit 9.

## ARGUMENT

Enamorado's motion to suppress his statements should be denied as he voluntarily decided to provide a statement where he made certain admissions but refused to accept responsibility for the shootings, after he understood the Miranda rights that were provided to him repeatedly, and after he signed a Miranda waiver form requesting to provide a statement.

### A. Background

The Fifth Amendment guarantees that no "person ... shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V.  Pursuant to that guarantee, a suspect must be advised of his Miranda rights prior to a custodial interrogation. Dickerson v. United States, 530 U.S. 428, 438 (2000); Miranda v. Arizona, 384 U.S. 436, 444 (1966). Because Enamorado made the statements while in police custody and during an interrogation, the Constitution required the Chelsea police department to inform him of his Miranda rights beforehand.

### B. The Defendant Received Miranda Warnings

Before Enamorado was questioned, he received his Miranda rights multiple times in Spanish.  Enamorado first received his rights at the Chelsea Police Station in the Booking area where they are posted and after viewing them posted in Spanish, he signed a form indicating he understood his rights.  Exhibits 5, and 6.

Once an effective Miranda warning is administered, those warnings remain effective until the passage of time or an intervening event makes the defendant unable to fully consider the effect of a waiver.  United States v. Hinkley, 803 F.3d 85, 92 (1st Cir. 2015).  In United States v. Pujols, the court denied suppression of defendant's statements when the defendant had been Mirandized twice on the day before he made the statements. 608 F. Supp. 2d 125, 127 (D. Mass. 2008); see also United States v. Pruden, 398 F.3d 241, 247 (3d Cir. 2005) (finding twenty hour time lapse between warnings and statements insufficient to render defendant's waiver ineffective); United States v. Nguyen, 608 F.3d 368, 375 (8th Cir. 2010) (concluding that full-day break in questioning did not make Miranda warnings ineffective); Guam v. Dela Pena, 72 F.3d 767, 770 (9th Cir. 1995) (fifteen-hour interval between the Miranda warnings and the questioning did not render defendant's confession inadmissible).

Here, the proper administration of the rights at Booking covers that questioning minutes later by the detectives upstairs in the police station by the trooper and detective.

Enamorado was then taken upstairs to be interviewed and Detective Garcia handed him a document listing the Miranda warnings in Spanish.  Exhibits 1, and 8.  He received his Miranda rights again, this time verbally, when Detective Garcia read the rights to him in Spanish as Enamorado followed along on a separate form. Id.  The still photographs of the interview clearly depict Enamorado looking at the rights form as it is being read to him by Detective Garcia.  Id.  Finally, Enamorado signed a waiver of his Miranda rights, written in Spanish, before Trooper O'Connor, who signed the waiver as a witness along with Detective Garcia, who also signed it, at 9:35 p.m.  See Exhibits 1 and 8, depicting Enamorado signing the waiver form.   Enamorado's questioning began only once these steps were completed.

### C. The Defendant Understood the Miranda Warnings

Enamorado received his rights in his native language, both verbally and in writing.

Detective Garcia, who read him his rights in Spanish, will testify that Enamorado appeared at all times to understand the rights read to him. Enamorado himself expressly acknowledged as much by circling "Yes" ("Si") where the waiver asks whether he understood what Detective Garcia said ("Comprende lo que le he dicho?"). See Exhibit 1. Detective Garcia will also testify that Enamorado appeared at all times to understand the written Miranda rights statement Enamorado read and the waiver Enamorado signed. Id. Detective Garcia always understood what Enamorado said, and answering all of his questions without mentioning any difficulty at all, let alone one due to a difference in Spanish dialect. Finally, at the conclusion of the interview, Detective Garcia explained the process of taking a DNA sample by buccal swab and Enamorado agreed again signing a separate waiver form in Spanish stating that he understood his rights and voluntarily consent to provide the buccal swab for DNA. Exhibit 9. This further demonstrates Enamorado's complete understanding of the discussions and language used.

### D. The Defendant Waived His Rights Voluntarily

After receiving his rights in Spanish multiple times, in multiple forms—verbal and written—the defendant validly waived his rights and asked to tell his story. For the waiver to be knowing and intelligent, the defendant must make the waiver "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." See United States v. Bezanson-Perkins, 390 F.3d 34, 39 (1st Cir. 2004). This requires the court to examine the totality of the circumstances. Id. at 39–40.

A defendant may waive his Fifth Amendment rights so long as the waiver is given voluntarily and intelligently. See Miranda v. Arizona, 384 U.S. 436, 475 (1966). Voluntariness determinations are based on a totality of the circumstances test. See, e.g., United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990). Truly voluntary statements must have been: i) "a product of a free and deliberate choice rather than intimidation, coercion, or deception;" and ii)

"made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Colorado v. Spring, 479 U.S. 564, 573 (1987) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

Relevant factors include the particular manner in which the interview was conducted (i.e., the duration, location, and manner of the questioning), the defendant's experience with law enforcement, and his age, education and intelligence. See United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993) (discussing voluntariness factors). A defendant's mental and physical condition at the time may also be considered. See, e.g., United States v. Rosario Peralta, 199 F.3d 552, 564 (1st Cir. 1999) (finding valid waiver despite defendants being in recent boat collision and being hungry and wet in room where air conditioning was on); Campaneria v. Reid, 891 F.2d 1014, 1020 (2nd Cir. 1989) (finding valid waiver despite recent surgery, pain, dizziness and recent ingestion of pain medication because medical records showed defendant alert and awake); Seymour v. Walker, 224 F.3d 542, 554 (6th Cir. 2000) (finding valid waiver even though defendant was questioned in intensive care unit following suicide attempt); United States v. Huerta, 239 F.3d 865, 873 (7th Cir. 2001) (finding valid waiver even though defendant was tired and had taken medication on an empty stomach).

The defendant claims that this waiver was involuntary because Enamorado was been under the influence of narcotics and alcohol and had limited education. This claim is undermined by the facts. The officers observed no signs at all that Enamorado was under the influence or that he was inadequately educated. Indeed, every officer that encountered the defendant noticed no indicia of drugs/alcohol intoxication. The Booking officer, David Delaney listed no observations of intoxication when he contemporaneously completed the associated Booking form. Exhibit 4. Moreover, the court need not rely solely on the police observations because the video also captures Enamorado's behavior, movement and interactions during the

one-hour long interview.  See Exhibits 7 and 8.  Enamorado is plainly in control of himself and demonstrates no signs of intoxication nor drug use.  Id.

Enamorado also signed a written waiver of his rights.  Exhibit 1.  Courts consider defendants that sign such a written waiver of rights as "strong proof of the validity of the waiver."  North Carolina v. Butler, 441 U.S. 369, 373 (1979).  Enamorado signed a standard Spanish language waiver form advising him of his rights.  See Exhibits 1, and 2.  He acknowledged his rights, first, by circling "Si" for "Yes" where the form asks whether he understood the rights read to him; second, by circling "Si" where the form asked if he wanted to waive those rights voluntarily, consciously, and intelligently; and third, by signing and dating the form.  Id.

Written waivers, like Enamorado's, are solid proof of the soundness of the waiver due to the explicitness of the warning provided.  Butler, 441 U.S. at 373; see also United States v. Hack, 782 F.2d 862, 866 (10th Cir. 1986) (finding express waiver is "usually strong proof of the validity of that waiver").  Moreover, the fact that the waiver was executed immediately before the substantive interview further supports its validity.  See Patton v. Thieret, 791 F.2d 543 (1st Cir. 1986) (upholding waiver when given shortly before questioning).

Enamorado was provided his rights on several occasions in multiple forms and requested to speak with the officers.  His waiver of his rights is constitutionally sound.

### E.  Failure to Successfully Record Audio from the Defendant's Interview Does Not Violate His Rights

The defendant next tries to turn the police officers misfortune of not collecting recorded admissions by the defendant because, without the officer's knowledge, the audio failed to record.[2]  This claim is also wide of the mark.  From the outset, it is important to acknowledge

---

[2] The microphone of the recording system not properly functioning was detailed in

that there is no constitutional requirement that an interrogation be recorded.  As such, the exclusion of Enamorado's statements on this basis is not warranted.  There is also currently no federal statute or rule that requires a police custodial interrogation to be electronically recorded.  Any state laws or rules that may require electronic recording of a custodial interrogation are not applicable to the Court's analysis under Fed. R. Evid. 402, which limits this Court's determination of admissibility of relevant evidence to the U.S. Constitution or a federal statute or rule.  See Defendant's Memorandum of Law, p. 6, document #1855.

There is also no suggestion of wrongdoing by any officer in the equipment malfunction.  In Arizona v. Youngblood, 384 U.S. 436, 444 (1966) the Supreme Court explained that a defendant could set forth a due process violation only by showing police acted in bad faith in failing "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  See also United States v. Williamson, 859 F.3d 843 (10th Cir. 2017);  United States v. Williamson, F.3d 843 (10th Cir. 2017)  (We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.  We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.")

Here, there is no allegation of misconduct by the police in the malfunction of the recording equipment, because the both the facts and common sense indicate otherwise.  Simply

---

the report of the interview and the equipment was sent out for repairs.

stated, the police would surely preferred to have gathered a recorded statement of the defendant making admissions to key aspects of the shooting incident.  Moreover, they did not realize that the audio malfunction until after reviewing the recording later.  This claim as a basis of suppression also fails.

### F.  The Defendant's Affidavit is Not Evidence in This Case

It is well-settled in this District that the affidavit also does not constitute evidence at the hearing, unless the defendant testifies and is subject to cross-examination.  The First Circuit has recently stated, "Like the defendant in Baskin, Phillipos sought to establish the requisite factual predicate for his motion solely on the basis of his own affidavit, which he would not allow the government to test through cross-examination. …In light of Baskin, we see no basis for concluding that the District Court abused its discretion in finding that the affidavit, on its own, failed to establish the sufficient threshold showing of a factual dispute that Phillipos was required to make." United States v. Phillipos, 849 F.3d 464, 469 (1st Cir. 2017), as clarified on denial of reh'g, No. 15-1716, 2017 WL 3307482 (1st Cir. Aug. 3, 2017) citing United States v. Baskin, 424 F.3d 1 (1st Cir. 2005).

Accordingly, the contents of the defendant's affidavit provides no basis for relief  as it is not evidence in the hearing unless of course the defendant testifies under oath during the course of the evidentiary hearing.

**CONCLUSION**

Based on the foregoing, the United States respectfully requests that this court deny Hector Enamorado's Motion to Suppress.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney

By:   s/ Glenn A. MacKinlay

        GLENN A. MACKINLAY
        KUNAL PASRICHA
        CHRISTOPHER POHL
        KELLY LAWRENCE
        Assistant United States Attorneys

Date: February 13, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

By:  s/ Glenn A. MacKinlay
GLENN A. MACKINLAY
Assistant United States Attorney

Date:  February 13, 2018