UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 15-10338-FDS |
| | ) | |
| 20.  HECTOR ENAMORADO | ) | |
| a/k/a "VIDA LOCA," | ) | |
| | ) | |
| Defendant | ) | |

SENTENCING MEMORANDUM OF THE UNITED STATES

In the early morning hours of December 14, 2014, Hector Enamorado, also known by his MS-13 gang name "Vida Loca," fired multiple gunshots inside an apartment at 60 Chester Avenue in Chelsea, Massachusetts. At point-blank range, Enamorado fired three shots at Javier Ortiz, a rival gang member who had punched Enamorado and burned him with a cigarette the day before, and one shot at Saul Rivera, a pastry chef and innocent bystander to the gang members' feud. When Chelsea police officers responded to the scene, they encountered Rivera on the sidewalk near 60 Chester Avenue, suffering from a bullet wound to his chest. Inside the bathroom of the second-floor apartment, officers found Ortiz lying on the floor in a pool of his own blood. Ortiz died from his injuries a short time later. Rivera survived, but the bullet remains lodged in his chest, near his heart, to this day.

The murder of Ortiz resulted from a premeditated, coordinated effort by members of three separate MS-13 cliques to eliminate a rival gang member: Enamorado, a homeboy of the Chelsea Locos Salvatrucha clique, who fatally shot and killed Ortiz; Noe Perez Vasquez, a/k/a "Crazy," a homeboy and leader of the Everett Locos Salvatrucha clique, who gave Enamorado the murder weapon and orchestrated his attempted escape; and Luis Solis Vasquez, a/k/a "Brujo," a homeboy of the Eastside Locos Salvatrucha clique, who provided

armed back-up for Enamorado during the shooting. After trial, a jury convicted all three men of committing or knowingly participating in the murder of Ortiz in furtherance of the MS-13 racketeering conspiracy.

Significantly, the murder of Ortiz started and ended with Enamorado: he provided the motive, seeking revenge for having been disrespected and beaten by Ortiz, a rival gang member, a day earlier; he devised the plan, enlisting fellow MS-13 members to procure a gun and provide armed cover; and he executed the attack, firing the shots that killed Ortiz. Enamorado's motive, intent, and actions in murdering Ortiz provide a regrettably clear and concrete example of the MS-13 mission: control territory and eliminate rivals through violence. A sentence of life in prison is a necessary and appropriate punishment for Enamorado's crimes.

## I.       The Probation Office Correctly Calculated the Guidelines Sentencing Range.

The Probation Office correctly concluded that Enamorado's Guidelines sentencing range ("GSR") is life in prison, based on a total offense level ("TOL") of 43 and a criminal history category ("CHC") of II. PSR ¶¶43-64, 70-72. Specifically, the Probation Office determined that the evidence adduced at trial, together with the jury's verdict, supported a finding by a preponderance of the evidence that Enamorado's underlying racketeering activity included first-degree murder (the fatal shooting of Ortiz) and attempted murder (the non-fatal shooting of Rivera). PSR ¶44. The Probation Office thus found that the first-degree murder yielded an adjusted offense level ("AOL") of 43, the attempted murder yielded an AOL of 37 (base offense level 33 plus 4 levels for life-threatening injuries), and, after applying the Guidelines' grouping provisions, calculated Enamorado's TOL to be 44 (capped at 43).

Although he did not object to the PSR, Enamorado argues in his sentencing memorandum that the Probation Office incorrectly applied the first-degree murder guideline, USSG §2A1.1(a), to determine that his offense level for the Ortiz murder is 43. D.2744 at p.2. Enamorado contends that, because the jury was not instructed specifically to find that he committed first-degree murder, his offense level must be calculated using the second-degree murder guideline, USSG §2A1.2, which is 38.[1] D.2744 at pp.5-6. Enamorado's argument misses its mark. The Court instructed the jury that it did not have to distinguish between first- and second-degree murder in reaching its verdict because the maximum penalty for both first- and second-degree murder in Massachusetts is life imprisonment, *see* Mass. Gen. L. c.265, §2. Accordingly, the jury's finding that Enamorado committed or knowingly participated in the murder of Ortiz—whether in the first or second degree—in furtherance of the MS-13 racketeering conspiracy triggers the enhanced penalty provision of 18 U.S.C. §1963(a) and raises the statutory maximum penalty for Enamorado's RICO conspiracy conviction from 20 years to life.

It is well-settled that the Probation Office, and this Court, may make factual findings by a preponderance of the evidence at sentencing, provided that those findings do not expose the defendant to a sentence above the maximum penalty prescribed by the statute of conviction. *See, e.g., Apprendi v. New Jersey*, 530 U.S. 466 (2000). Here, the statutory maximum penalty for Enamorado's RICO conspiracy conviction is life imprisonment. Thus, even if the jury did not find beyond a reasonable doubt that Enamorado committed first-degree, as opposed to second-degree, murder, the Probation Office's finding by a preponderance of the

---

[1]It should be noted that, even if the second-degree murder base offense level of 38 were applied to the Ortiz murder, Enamorado's total offense level would be 40 (not 38, as he suggests) after the Ortiz murder and Rivera attempted murder are properly grouped.

evidence that Enamorado is responsible for first-degree murder is both legally permissible—as the Guidelines penalty for first-degree murder does not exceed the statutory maximum penalty of life imprisonment—and factually correct—as the trial evidence fully supports a finding that Enamorado committed the murder with premeditated malice aforethought.

Moreover, the application notes to USSG §2A1.1(a) make clear that the first-degree murder guideline is applicable to the facts of this case, and further, that life in prison is the appropriate sentence for Enamorado. *See* Application Note 1 to USSG §2A1.1(a) ("This guideline applies in cases of premeditated killing."); Application Note 2 to USSG §2A1.1(a) ("In the case of premeditated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed. A downward departure would not be appropriate in such a case.").

## II.     A Life Sentence is Appropriate Based on the Statutory Sentencing Factors.

### A.     Nature and Circumstances of the Offense

Enamorado committed a ruthless, premeditated murder of a rival gang member and gratuitously shot and injured an innocent bystander in furtherance of MS-13's violent mission. The undisputedly serious nature of these crimes warrants the severe punishment of life in prison.

Enamorado was a long-time member and homeboy of the Chelsea Locos Salvatrucha ("CLS") clique, which, for a time, was one of the strongest MS-13 cliques in the greater Boston area. PSR ¶¶22, 24. By December 2014, however, CLS's membership and influence had dwindled as clique members were arrested and deported, leaving it unable to control its turf. PSR ¶24. Enamorado, who remained an active MS-13 member, was "enraged" by his clique's loss of status and contemplated violence against his fellow CLS members to punish

them for their apathy and spur them to be more engaged and reclaim their turf. *Id*. *See* Trial Exhibit 270 at p.23.

On or around December 13, 2014, Enamorado visited the second-floor apartment at 60 Chester Avenue in Chelsea, which was known to be a place to buy beer and food after the bars closed. PSR ¶26. That night, Enamorado got into a fight with Javier Ortiz, a member of the rival 18th Street gang, and Ortiz punched Enamorado in the eye and burned his arm with a lit cigarette. *Id*. Also present in the apartment that night was Victor Ruiz, a/k/a "Vincentino," a/k/a "Chentino," an MS-13 homeboy with the Eastside Locos Salvatrucha ("ESLS") clique. Enamorado later told other MS-13 members that Vincentino failed to defend Enamorado during his fight with Ortiz. *Id*.

The next night, on December 14, 2014, Enamorado and Ortiz again met in the after-hours beer hall at 60 Chester Avenue. PSR ¶27. Saul Rivera was inside the apartment that night, having a beer and some tamales in the kitchen after he got off work. *Id*. According to Rivera, Enamorado and Ortiz had an argument that was broken up by another person in the apartment. *Id*. After the argument, Ortiz left the apartment and returned approximately 20 minutes later; soon after Ortiz returned, Enamorado left the apartment. *Id*.

Enamorado then called Crazy, who was hanging out with other MS-13 members at the garage where the ESLS clique held their meetings. PSR ¶28. Enamorado told Crazy that he was at a place with the 18th Street gang member who had beaten him up the night before, and Enamorado asked Crazy to bring him the .380 gun that Crazy carried because Enamorado was going to kill the "culero."[2] *Id*. Crazy told the MS-13 members at the garage

---

[2] MS-13 members testified at trial that the terms "culero" and "chavala" refer to rival gang members, primarily 18th Street gang members.

that he was going to take his gun to Enamorado, and Brujo, who was present and also had a gun, offered to go along to help Enamorado. *Id*. When Crazy and Brujo arrived in Chelsea, they met Enamorado outside 60 Chester Avenue. PSR ¶31. Crazy gave Enamorado his gun, and Enamorado told Brujo to come inside with him to guard the door while he killed the culero. *Id*.

Enamorado and Brujo, both armed, went upstairs to the second-floor apartment. When they entered, they spotted Vincentino on the back porch and went to greet him. *Id*. Shortly after, Enamorado reentered the apartment, walked through the kitchen with his gun at his side, and headed down the front hall toward the bathroom. PSR ¶32. As Ortiz exited the bathroom, Enamorado immediately fired three shots at him from point-blank range. *Id*. Enamorado turned away from the bathroom and fired one shot at Rivera's chest before fleeing the apartment. *Id*.

Hours later, Crazy was recorded discussing the murder with another MS-13 member. PSR ¶33. Crazy explained that Enamorado had gotten into a fight with a rival gang member and had called Crazy to bring him his gun so Enamorado could kill the culero. *Id*. Crazy said that Enamorado "killed the guy, that's not bullshit . . . he shot him and shot the other one." *Id*.; Trial Exhibit 214, at p.8. A few days later, law enforcement arrested Enamorado, who was in a car with Crazy, as he was attempting to flee from Massachusetts. PSR ¶37. About a week or two after the murder, Crazy attended an ESLS clique meeting on Enamorado's behalf. PSR ¶38. Crazy demanded that ESLS punish Vincentino for violating MS-13 rules, namely, for failing to defend a fellow MS-13 member, Enamorado, in his fight with Ortiz the day before the murder. *Id*.

The murder of Ortiz, a rival gang member, bears all of the hallmarks of an MS-13 gang hit: Enamorado engaged in a fight with Ortiz because he was an 18th Street gang member; Enamorado enlisted the support of MS-13 members to obtain a gun and secure back-up for his planned killing; and after he murdered Ortiz and shot Rivera, Enamorado relied on MS-13 members to help him escape and demanded that MS-13 enforce its rules by punishing the member who failed to step up and defend him. In every respect, Enamorado embodied the violent ethos of MS-13, and a life sentence is a just and appropriate punishment for the brutal crimes he committed.

**B.      History and Characteristics of the Defendant**

Enamorado was born in Honduras in 1978 and entered the United States illegally in 1995, when he was 16 or 17 years old. PSR ¶¶84-85. Apart from a six-month stint in Pennsylvania in 2002, Enamorado has lived in Chelsea since he came to the United States. PSR ¶85. Enamorado enjoyed good relationships with his mother, who immigrated to the United States when he was approximately seven years old, and his grandparents, who raised him in Honduras after his mother left. PSR ¶84. By his own account, Enamorado did not suffer from any physical, emotional, or substance abuse as a child, although he has had substance abuse issues (alcohol and marijuana) in his teenage and adult years. PSR ¶102. It is unclear when or why Enamorado joined MS-13, but it is clear that well before he committed the December 14, 2014 murder and attempted murder, he was a homeboy and active member of the CLS clique. Notwithstanding his present denials of MS-13 affiliation, several cooperating witnesses identified Enamorado as an MS-13 homeboy, and he himself admitted

his MS-13 membership in a post-arrest interview.[3] Absent any significant mitigating factors, and there appear to be none, Enamorado must be held accountable for the murder and attempted murder he committed in furtherance of the MS-13 racketeering enterprise.

### C.   Need for the Sentence Imposed to Afford Adequate Deterrence, Reflect the Seriousness of the Offense, and Promote Respect for the Law.

A sentence of life in prison reflects the extreme seriousness of the crimes committed by Hector Enamorado. The Court presided over the trial of Enamorado and his co-conspirators Noe Salvador Perez Vasquez, a/k/a "Crazy," and Luis Solis Vasquez, a/k/a "Brujo," during which evidence of Enamorado's murder of Javier Ortiz and attempted murder of Saul Rivera was presented to the jury. The Court also heard the testimony of several cooperating witnesses, who were themselves members of MS-13 and who described in great detail the culture of fear and violence that permeates the gang. The evidence paints a grim picture of the MS-13 racketeering enterprise generally and of Enamorado's role in furthering the gang's mission specifically. Enamorado was a full, knowing, and willful participant in furthering the MS-13 mission to dominate its rivals, maintain order within its ranks, and rule its turf. As CW-11 aptly put it, MS-13 wants "to control everything," and it uses violence as the means to that end.

A sentence of life imprisonment is an apt punishment for Enamorado's crimes. It will deter others from embracing MS-13's mission of ruthless, perpetual, and senseless violence.

---

[3] Additionally, recordings of MS-13 members German Hernandez Escobar, a/k/a "Terible," and Jose Rene Andrade, a/k/a "Innocente," include conversations with and about Enamorado that confirm his status as an MS-13 homeboy. *See* Trial Exhibit 270 at pp.20-21, 23; Ex. 218.6 at pp.1-2, 5; Ex. 218.8 at p.6; Ex. 218.12 at pp.4-7. Further, Enamorado's phone contact list contained the name and numbers of over a dozen MS-13 gang members, including "Checha," "Creisi [Crazy]," "Inocente," "Terrible," "Seco," "Ninja," and "Tigre." *See* Trial Exhibit 152.4.

It will protect the public from Enamorado. It will provide some measure of comfort to the victims and families of the victims, who suffer daily because of Enamorado's calculated and callous actions and live in constant fear of retribution. Notably, Saul Rivera, who survived being shot in the chest by Enamorado, literally carries the trauma of that fateful night with him to this day, in the form of the bullet lodged less than a quarter inch from his heart. At trial, Dr. Pierre Borczuk, the attending emergency room physician at Mass General Hospital who treated Rivera, testified that the bullet's location was "very close to the pulmonary artery," and if the bullet had hit that artery, Rivera would have lost a "tremendous" amount of blood, rendering him unstable and requiring emergency surgery to repair the artery. Transcript Day 13, at p.66. Dr. Borczuk further testified that the bullet was "very, very close to the lining of the heart or the sac around the heart" and explained that if the bullet had pierced the heart sac, the resulting blood loss would have "suffocate[d] the heart and prevent[ed] it from beating." *Id.*

The tangible and intangible pain and suffering inflicted by Enamorado on his victims and their families cannot be underestimated. So too the fear and chaos that Enamorado and his fellow MS-13 members spread throughout the community with their gang-fueled acts of violence. In this case, a life sentence is the only punishment that achieves the goals of sentencing.

## CONCLUSION

For all of the foregoing reasons, the Court should sentence Hector Enamorado to life

in prison. The government also requests that the Court impose five years of supervised release

and order Enamorado to pay restitution to the victims of his crimes.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     /s/ Kelly Begg Lawrence
Kelly Begg Lawrence
Christopher Pohl
Glenn A. MacKinlay
Kunal Pasricha
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify the foregoing document was filed through the
Electronic Court Filing (ECF) system on September 27, 2018 and will be sent electronically
to the registered participants as identified in the Notice of Electronic Filing.

/s/ Kelly Begg Lawrence
Kelly Begg Lawrence
Assistant U.S. Attorney
